**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS, BOSTON**

| | |
|---|---|
| **HEANG OUCH on behalf of himself and all others similarly situated,**<br><br>**Plaintiff,**<br>**vs.**<br><br>**INDEPENDENT NATIONAL MORTGAGE CORPORATION** *also known as* **INDYMAC BANK, ONEWEST BANK, IMB HOLDCO, LLC, IMB MANAGEMENT HOLDINGS, LP, DUNE CAPITAL, LLC, J.C.FLOWERS & CO, MSD CAPITAL, L.P., STONE POINT CAPITAL, SOROS FUND MANAGEMENT, LLC, SSP OFFSHORE, LLC, PAULSON & CO, SILAR ADVISORS, LP, SILAR MCF-1, LLC, FEDERAL NATIONAL MORTGAGE ASSOCIATION** *also known as* **Fannie Mae** *and/or* **FNMA, HARMON LAW, P.C. MORTGAGE ELECTRONIC REGISTRATION SYSTEMS**<br><br>**Defendants.** | **C.A. NO. __-_____**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>11CU11371 |

## INTRODUCTION

1.     Plaintiff Heang Ouch, on behalf of himself and all other similarly-situated individuals ("Plaintiffs") bring this class action as described in the paragraphs set forth herein.

2.     This complaint arises from the acts and/or omissions (intentional and or otherwise) of following Defendants OneWest Bank, acting independently and or through its subsidiaries, owners and/or predecessor in interest and or successors in interest Defendants: Independent National Mortgage Corporation also known as IndyMac Bank; IMB HoldCo, LLC;

Dune Capital, LLC; J.C. Flowers & Co.; MSD Capital, L.P.; Stone Point Capital; Soros Fund Management, LLC; SSP Offshore, LLC; Paulson & Co.; Silar Advisors, LP;  SILAR MCF-1, LLC;  Federal National Mortgage Association; Harmon Law, P.C.; and Mortgage Electronic Registration Systems (referred to jointly as "Defendants" where not otherwise described in their individual capacities) as a result of:

> a.  fraudulently lowering mortgage underwriting standards and inflating appraisals with full knowledge that customers obtaining mortgages as a result would likely default;
>
> b.  deceptively misleading borrowers by willfully, and purposefully violating agreements they made directly with the United States Government to follow guidelines and directives set forth for the review of applications from homeowners to have their mortgages modified and thereby prevent unnecessary foreclosures while publicly claiming to follow said programs guidelines and acting to preserve home ownership;
>
> c.  violations of State Uniform Commercial Code by foreclosing on Plaintiff's property when no default existed;
>
> d.  failing to disclose to the Plaintiffs its policies regarding payments made on Plaintiff's behalf regarding his mortgage by Defendants to the Trust which held Plaintiff's Note/Deed of Trust and Mortgage;
>
> e.  by participating in a fraudulent scheme to foreclose on Plaintiffs by engaging in the use of, and or condoning of forged documents used to purportedly create a valid chain of title allowing foreclosure (i.e. "robo-signing", assignments to entities not in existence at time of said assignments, etc.) and foreclosing when no default existed.

3.  Plaintiff's claims are sixfold:

c. Defendants violated state Uniform Commercial Code by foreclosing on Plaintiff when no actual default existed. Defendants knew that no default existed and purposefully, willfully and fraudulently foreclosed on plaintiff anyway;

d. Plaintiff's have the right to full and complete disclosure of the Defendants' business practices, especially when those business practices create conflicts of interest, are deceptive and misleading consisting of, inter alia, a fraudulent scheme to foreclose on as many borrower's homes as possible, regardless of public claims to the contrary, in an effort to take advantage of a loss sharing agreement with the Federal Government which would ultimately allow Defendants to earn a profit on the majority of homes foreclosed upon and/or sold short ("short sales").

4. Plaintiff's have the right to full and complete disclosure of facts regarding the Defendants deceptive participation in a fraudulent scheme to foreclose and/or attempt to foreclose on Plaintiffs by means of the drafting, executing, and/or condoning the use of forged documents critical to establish any right to foreclose (*"robo-signing"*) and, that Plaintiffs have the right to be informed if as the result of said conduct prior foreclosures and/or attempts to foreclose were binding. complaint seeks a declaratory judgment that an alleged "Assignment" of the Plaintiff's mortgage loan from Defendant, Mortgage Electronic Registration Systems ("MERS") to Defendant, OneWest Bank FSB ("OneWest") is invalid and that, as a result, OneWest was not the valid mortgagee at all times relevant to the foreclosure sale on Plaintiff's property. As grounds set forth the Plaintiff avers that the "Assignment of Mortgage" from the Defendant, Mortgage Electronic Registration Systems ("MERS"), to Defendant, OneWest Bank FSB, was not validly executed by foreclosure counsel Andrew Harmon and that the "Assignment of

4

Mortgage" failed to assign the Mortgage and Note in accordance with Massachusetts Law. Plaintiff further avers that the Assignment of Mortgage executed by Andrew Harmon and the Foreclosure Deed executed by Chamagne Williams were not executed with requisite authority and effect.

## JURISDICTION AND VENUE

5.      This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d) in that this complaint is a putative class action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are 100 or more members in the proposed class and the named plaintiffs are citizens of a State different from Defendants.   One West is, on information and belief, a citizen of California. Plaintiff is a citizen of Massachusetts.

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), because Plaintiffs are residents of Massachusetts and Defendants transact substantial business in this district.

## PARTIES

7.      Individual and Representative Plaintiff Heang Ouch is a citizen of Massachusetts residing at 43 Inland Street, Lowell, MA 01851 which is the subject property referenced herein.

8.      Defendant Independent National Mortgage Corporation (also known as IndyMac Bank was a banking and mortgage lending/servicing entity which was taken over by the FDIC in July of 2008 and was purchased from the FDIC by IMB HoldCo, Inc., at which time its headquarters were located in the state of California.

9.      Defendant OneWest Bank is a banking and mortgage lending/servicing entity which is a wholly owned subsidiary of IMB HoldCo, LLC, located at 888 East Walnut Street, Pasadena, California 91101.

5

10.     Defendant IMB HoldCo, LLC is a financial services holding company which is owned by IMB Management Holdings, LP, which upon information and belief is located at 888 East Walnut Street, Pasadena, California 91101.

11.     Defendant IMB Management Holdings, LP is a limited partnership is owned by a consortium of private equity investors, which controls and/or owns IMB HoldCo, LLC , which upon information and belief is located at 888 East Walnut Street, Pasadena, California 91101.

12.     Defendant Dune Capital, LLC is a limited liability company, which is part of the consortium that controls and/or owns IMB Management Holdings, LP, which upon information and belief is located at 623 Fifth Avenue, 30th Floor, New York, NY 10022.

13.     Defendant J.C. Flowers & Co. is a company, which is part of the consortium that controls and/or owns IMB Management Holdings, LP, which upon information and belief is located at 717 Fifth Avenue, 26th Floor, New York, NY 10022.

14.     Defendant MSD Capital, L.P. is a limited partnership which is part of the consortium that controls and/or owns IMB Management Holdings, LP, which upon information and belief is located at 645 Fifth Avenue, 21st Floor, New York, NY 10022.

15.     Defendant Stone Point Capital is a company which is part of the consortium that controls and/or owns IMB Management Holdings, LP, which upon information and belief is located at 919 Third Avenue, Suite 39314, New York, NY 39314.

16.     Defendant SSP Offshore, LLC is a limited liability company which is part of the consortium that controls and/or owns IMB Management Holdings, LP, which upon information and belief is located at 888 Sevenths Avenue, 33rd Floor, New York, NY 10106.

17.     Defendant Soros Fund Management, LLC is a limited liability company that controls and/or owns SSP Offshore, LLC, which upon information and belief is located at 888 Sevenths Avenue, 33rd Floor, New York, NY 10106.

18.     Defendant SILAR MCF-1, LLC is a limited liability company which is part of the consortium that controls and/or owns IMB Management Holdings, LP, which upon information and belief is located at 333 Seventh Avenue, FL3, New York, NY 10001.

6

19.     Defendant Silar Advisors, LP is a limited partnership that controls and/or owns SILAR MCF-1, LLC, which upon information and belief is located at 333 Seventh Avenue, FL3, New York, NY 10001.

20.     Defendant Paulson & Co is a company which is part of the consortium that controls and/or owns IMB Management Holdings, LP, which upon information and belief is located at 1251 Avenue of the Americas, 50th Floor, New York, NY 10020.

21.     Defendant Federal National Mortgage Association is located ted at 3900 Wisconsin Avenue, NW, Washington, DC 20016. Upon information and belief FNMA was and or is trustee for an unknown number of securitized trusts including the Residential Asset Securitization Trust which is the trust that currently alleges to own the class action Plaintiff property and or loan.

22.     Defendant Harmon Law, PC is a law firm which represented Defendant Federal National Mortgage Association in the foreclosure matter regarding the Plaintiff's subject property referenced herein. Upon information and belief Defendant Harmon Law is located at 150 California Street, Newton, MA 02458.

23.     Defendant, Mortgage Electronic Registration Systems, ("MERS") is Delaware Corporation, not authorized to do business in the Commonwealth of Massachusetts, that allegedly simplifies the way mortgage ownership and servicing rights are originated, sold and tracked. It is not a lender or a servicer and is nothing more than a mortgage placeholder allowing promissory notes to be sold without complying with the Massachusetts General Laws. MERS is identified as a Mortgagee of a mortgage executed by Ouch and other Plaintiffs in the class, to secure payment of an alleged Note to IndyMac Bank FSB in the amount of $192,000.00.

24.     At all times herein mentioned, Defendants, both individually and collectively, are and were agents and/or joint venturers of each other, and in doing the acts alleged herein were acting within the course and scope of such agency.

25.     In March 2009 the FDIC held an auction for IndyMac Bank, which it had seized in 2008, and sold it as New IndyMac Bank to Defendant IMB HoldCo, LLC. On March 19,

7

2009 One West Bank began operations as a newly formed Pasadena, California based federal savings bank. From and after its acquisition of IndyMac in March 2009 and continuing to the present, both as a successor in interest to IndyMac and as principals, Defendants have engaged in and continued the wrongful conduct complained of herein.

26.     Each Defendant had actual and/or constructive knowledge of the acts of the other Defendant as described herein, and ratified, approved, joined in, acquiesced in, and/or authorized the acts of the other, and/or retained the benefits of said acts.

## FACTUAL BACKGROUND

### A.     Fraudulent Scheme Designed and Executed by the Defendants

27.     Defendant Independent National Mortgage Corporation (hereinafter referred to as "IndyMac") was among the leading providers of residential real estate mortgages in Massachusetts and the ninth largest mortgage originator in the United States during all times relevant to this complaint.

28.     IndyMac Bank was founded as Countrywide Mortgage Investment in 1985 by David S. Loeb and Countrywide Financial CEO Angelo Mozillo as a means of collateralizing Countrywide Financial's loans too large to be sold to then quasi-governmental mortgage backed securities investors Fannie Mae or Freddie Mac. In 1997, Countrywide sold IndyMac as an independent company run by Michael Perry, who remained its CEO until the downfall of the bank in July of 2008.

29.     The fraud perpetrated by IndyMac from 2000 through its acquisition, including OneWest Bank (starting no later than 2009) was willful and pervasive. It began with simple greed and then accelerated when IndyMac discovered it could not sustain its business, unless it systematically created false and inflated property valuations, significantly reduced its underwriting standards and created increasingly complex, esoteric, and high risk loan products to induce Plaintiffs and other borrowers into ever larger loans on increasingly risky terms. As

8

IndyMac knew from no later than 2004, these loans were unsustainable for the borrowers and to a certainty would result in a crash that would destroy the equity invested by Plaintiffs and other IndyMac borrowers. Further, those actions would cause the high risk pools of mortgages sold to REMICs to default on a nationwide scale. IndyMac publicly claimed the fiscal soundness of its products, while issuing internal memos/emails which recognized the dubious nature of same.

30. With their fraudulently obtained mortgages, IndyMac executed their plan to "pool" the foregoing mortgages and sell the pools for inflated value to REMICs that would pay for the mortgages by issuing Bonds (mortgage backed securities/MBS) to investors on a global scale. IndyMac knew that these mortgages had been made by significantly reducing credible underwriting standards to the point where they knew that, regardless of their representations to the contrary, the likelihood of borrower default on these mortgages was extremely high.

31. Rapidly, these intertwined schemes grew into a brazen plan to disregard underwriting standards and fraudulently inflate property values – county-by-county, city-by-city, person-by-person – in order to take business from legitimate mortgage providers, and moved on to massive securities fraud hand-in-hand with concealment from, and deception of, Plaintiff and other mortgagors on an unprecedented scale.

32. IndyMac's senior management led by Michael Perry knew the scheme would cause a liquidity crisis that would devastate Plaintiff's home value and net worth.

33. At the very least, at the time of entering into the note and/or deed of trust referenced herein with respect to Plaintiff, IndyMac, each Defendant originating a mortgage, and each Defendant in the Chain of title of the foregoing mortgages and the successors to each of the foregoing (collectively the "the Defendants"), were bound and obligated to fully and accurately disclose to each borrower, including each Plaintiff herein, that the mortgage being offered to the Plaintiff was, in fact, part of a massive fraud that IndyMac knew would result in the loss of the Plaintiff's home equity, would cause severe impairment to the Plaintiff's credit rating and eventually the potential loss of Plaintiffs' homes through foreclosure.

9

34.    It is now all too clear that this was the ultimate high-stakes fraudulent investment scheme of the last decade. Couched in banking and securities jargon, the deceptive gamble with consumers' primary assets –their homes- was (and still is) nothing more than a financial fraud perpetrated by IndyMac and others on a scale never before seen. This scheme was a significant contributing factor which led directly to a mortgage meltdown in Massachusetts (and nationwide) causing home values to decrease significantly. IndyMac's business premise was to leave the borrowers, including Plaintiff, responsible once IndyMac and its executives had received huge salaries, bonuses, and sold IndyMac stock options or shares based on their inside information, while investors were still buying the MBSs in increasingly overpriced and high risk mortgage pools and before the inevitable market collapse.

**B.    Furtherance of Fraudulent Scheme by OneWest**

35.    In March 2009, Defendant IMB HoldCo, LLC and its consortium of investor Defendants acquired IndyMac as New IndyMac Bank, from the Federal Deposit Insurance Corporation (FDIC). From and after its acquisition of IndyMac in March 2009 and continuing to the present, both as a successor in interest to IndyMac and as a principal, IMB HoldCo, LLC has engaged in and continued the wrongful conduct complained of herein.

36.    To further capitalize on the aforementioned acts, Defendant IMB HoldCo, LLC negotiated a loss sharing arrangement as part of its agreement with the FDIC to purchase the assets of IndyMac guaranteeing that they would be partially compensated for losses from qualifying loans as follows;

a.    New IndyMac assuming the first 20% of losses after which the FDIC will share losses 80/20 for the next 10% of losses and 95/5 thereafter.

This insulated OneWest Bank, IMB HoldCo, LLC, IMB Management Holdings, LP and its consortium of investor Defendants from the losses normally associated with defaulted mortgages and/or mortgage pools, enabling Defendants to foreclose (or facilitate short sales) on borrower's

10

property and ultimately realize a profit on the majority of foreclosed properties and/or short sales (and if necessary, enabling them to repurchase said mortgages and/or pools of mortgages, with minimal financial consequence). Defendants knew they would be able to make significant profits by, ignoring their obligations and public proclamations to assist homeowners nationwide under a Federal Government program they agreed to abide by, and instead foreclose and/or facilitate short sales on as many defaulted mortgages as fast as possible. This was done even as borrowers desperately sought, in good faith, to modify their mortgages. Defendants' conduct was misleading, deceptive and willful constitutes a fraud perpetrated on Plaintiffs.

37.     Furthermore the Defendants deceptively mislead Plaintiffs by executing an agreement with the federal government to participate in a program and abide by its guidelines to assist homeowners in modifying their mortgages in an effort to stem the nationwide tide of foreclosures while full well knowing they could not abide by the terms of said agreement due to mortgage modification restrictions contained in the legally binding pooling and servicing agreements (PSAs) executed by Defendant IndyMac Bank when they pooled and sold their mortgages. The restrictions are typically placed in the majority of private label (non-governmental) PSAs of securitizations of residential real estate mortgages (Restrictive PSAs) as a method of protecting the revenue stream paid to investors in the Mortgage Backed Securities. If a large enough percentage of mortgages in a given pool is modified then there will not be enough revenue to cover the payments due MBS holders. To compound the problems presented by this situation, Restrictive PSAs require 100% of the bond holders consent in order to change the terms of a Restrictive PSA. As mortgage securitizations result in thousands of bonds being sold globally, it practically impossible to obtain 100% consent regarding any issue once the securitization is complete. As a significant amount of the mortgages made by IndyMac were of the "non-conforming" type (i.e. Alt-A, Jumbo, Sub-Prime, No Income Verification, No Asset Verification, No-Doc, Low-Doc, Interest Only Payment, and Negative Amortization mortgages) they were not eligible for securitizations to the Federal Government or Fannie Mae or Freddie Mac. As such the majority of IndyMac's securitizations were private label securitizations which

11

are typically governed by Restrictive PSAs. This information was deceptively and purposefully withheld (and continues to be withheld) from homeowners in Massachusetts and nationwide.

38.   As a result of the aforementioned loss sharing agreement with the FDIC regarding qualified loans, and the Restrictive PSAs they were now obligated to abide by Defendants OneWest Bank, IMB HoldCo, LLC, IMB Management Holdings, LP, and its consortium of investor Defendants devised a plan to profit from their current situation. Mortgages were placed in several categories and dealt with as follows;

> a.   to maximize profits, all mortgages considered as qualifying loans under the loss sharing agreement with the FDIC would be foreclosed upon and/or sold short whenever possible, as opposed to being modified, and;
>
> b.   mortgages which are serviced for REMICs and have Restrictive PSAs were to remain in default status for a time lengthily enough so as to maximize recoverable expenses and then foreclosed on or sold short;
>
> c.   the number of mortgages which would be allowed to be modified under the modification percentage limitations of existing Restrictive PSAs, and those mortgages that do not qualify for FDIC loss sharing would receive modification consideration, serving the double purpose of appearing that the Defendants were complying with the agreement they made to participate in the aforementioned Federal Government program to assist homeowners, and to stay in compliance with existing PSAs.

12

39.     Defendants insatiability for profit was so recklessly blind it foreclosed on borrowers homes as fast as it could by employing tactics such as filing affidavits without personal knowledge (a practice more commonly referred to as "robo-signing"), filing lost note affidavits for notes that are not lost, and filing and/or failing to file improper assignments of mortgage to ensure the continuation of huge profits all the while representing they were working to assist homeowners in saving their homes and was losing money on foreclosure activity.

40.     Defendants also foreclosed on Plaintiff and others nationwide knowing that no default actually existed. In typical mortgage securitizations mortgages are added together with other mortgages and a pool of mortgages is created. That pool of mortgages is then sold to a Trust and/or REMIC which becomes the actual owner/holder of the Note/Deed of Trust and Mortgage. As such, the Note-holder cannot enforce the default provisions of said Note/Deed of Trust unless a default exists. Under the governing PSAs entered into by servicers with the Trusts that purchases the pool of mortgages, IndyMac and any other subsequent servicing entity of the loans in that Trust (i.e. OneWest Bank), is required to forward payment on any and all defaulted mortgages to said Trust. This is a standard provision and practice in residential mortgage securitizations, with the exception of Government backed securitizations (FHA, VA, Ginnie Mae.). As such the Plaintiff's mortgage payments were in fact made to the Note-holder and no enforceable default existed. As the records regarding the securitization of the Plaintiff's mortgage are held by Defendants, this information can only be obtained through discovery. However, it is upon information and belief that the Plaintiff's mortgage was securitized in standard fashion and that no actual default of the Note existed when foreclosure was initiated and completed. As a result, Plaintiff has lost equity in his home, his credit rating and history was damaged or destroyed, and Plaintiff incurred material costs and expenses.

39.     The defendants' improper acts still continue, including, *inter alia*:

        a.     misrepresenting their intentions to arrange loan modifications for Plaintiffs, while in fact purposefully creating abusive roadblocks to

13

deprive plaintiffs of the opportunity to seek assistance under a federal government program Defendants publicly represented they would abide by;

b. deceptively misleading Plaintiffs by publicly claiming to be a participating servicer in a federal government mortgage modification program yet purposefully ignoring guidelines and directives of said federal program, seeking instead to enrich themselves by foreclosing (and/or facilitating short sales) on borrowers properties, while borrowers seek, in good faith, to modify their mortgages under said federal program;

c. engaging in intrinsic fraud by willfully, purposefully and systematically stalling Plaintiffs' legitimate requests to cancel foreclosures while actively seeking to be considered for a modification, in direct violation of guidelines and directives of aforementioned federal program;

d. deceptively and fraudulently seeking to and/or completing foreclosures on Plaintiff and other borrower's homes while having full knowledge that foreclosure documents are improperly reviewed (or not reviewed at all) and/or executed with fraudulent and/or improper signatures and;

e. deceptively and fraudulently seeking to and/or completing foreclosures on Plaintiff and other borrower's homes while having full knowledge that no actual default under the terms of the Note/Deed of Trust exists.

14

## A.    The Foreclosure Crisis

40.    Over the last three years, the United States has been in a foreclosure crisis. In late 2009, a congressional oversight panel noted that one in eight U.S. mortgages was in foreclosure or default.[1]

41.    For the third quarter of 2010, national foreclosure filings -- default notices, scheduled auctions and bank repossessions -- were reported on 930,437 properties in the 3rd quarter. One in every 139 U.S. housing units received a foreclosure filing in this quarter.[2]

42.    Increased foreclosures have a detrimental effect not just on the borrowers who lose unique property and face homelessness, but also on the surrounding neighborhoods that suffer decreased property values and municipalities that lose tax revenue.

43.    The foreclosure crisis is not over. Economists predict that interest rate resets on the riskiest of lending products will not reach their zenith until sometime in 2011. *See* Eric Tymoigne, *Securitization, Deregulation, Economic Stability, and Financial Crisis*, Working Paper No. 573.2 at 9, Figure 30,[3] (citing a Credit Suisse study showing monthly mortgage rate resets).

## B.    Creation of the Home Affordable Modification Program

44.    Congress passed the Emergency Economic Stabilization Act of 2008 on October 3, 2008 and amended it with the American Recovery and Reinvestment Act of 2009 on February 17, 2009 (together, the "Act"). 12 U.S.C. § 5201 *et seq.* (2009).

45.    The purpose of the Act is to grant the Secretary of the Treasury the authority to restore liquidity and stability to the financial system, and ensure that such authority is used in a manner that "protects home values" and "preserves homeownership." *Id.*

---

[1] Congressional Oversight Panel, Oct. 9, 2009 report at 3. *Available at* http://cop.senate.gov/reports/library/report100909-cop.cfm.
[2] Reality Trac Staff, *Foreclosure Activity Increases 4% in Third Quarter* (October 14, 2010). *Available at* http://www.realtytrac.com/content/press-releases/q3-2010-and-september-2010-foreclosure-reports-6108.
[3] *Available at* http://papers.ssrn.com/so13/papers.cfm?abstract_id=1458413

46.     The Act grants the Secretary of the Treasury the authority to establish the Troubled Asset Relief Program, or TARP.  12 U.S.C. § 5211.  Under TARP, the Secretary may purchase or make commitments to purchase troubled assets from financial institutions.  *Id.*

47.     Congress allocated up to $700 billion to the United States Department of the Treasury for TARP.  12 U.S.C. § 5225.

48.     In exercising its authority to administer TARP, the Act mandates that the Secretary "shall" take into consideration the "need to help families keep their homes and to stabilize communities."  12 U.S.C. § 5213(3).

49.     The Act further mandates, with regard to any assets acquired by the Secretary that are backed by residential real estate, that the Secretary "shall implement a plan that seeks to maximize assistance for homeowners" and use the Secretary's authority over servicers to encourage them to take advantage of programs to "minimize foreclosures."  12 U.S.C. § 5219.  The Act grants authority to the Secretary of the Treasury to use credit enhancement and loan guarantees to "facilitate loan modifications to prevent avoidable foreclosures."  *Id.*

50.     The Act imposes parallel mandates to implement plans to maximize assistance to homeowners and to minimize foreclosures.  12 U.S.C. § 5220.

51.     On February 18, 2009, pursuant to their authority under the Act, the Treasury Secretary and the Director of the Federal Housing Finance Agency announced the Making Home Affordable program.

52.     The Making Home Affordable program consists of two subprograms.  The first sub-program relates to the creation of refinancing products for individuals with minimal or negative equity in their home, and is now known as the Home Affordable Refinance Program, or HARP.

53.     The second sub-program relates to the creation and implementation of a uniform loan modification protocol, and is now known as the Home Affordable Modification Program, or HAMP.  It is this subprogram that is at issue in this case.

Case 1:11-cv-11371-RGS   Document 1   Filed 07/29/11   Page 16 of 40

54.     HAMP is funded by the federal government, primarily with TARP funds.  The
Treasury Department has allocated at least $75 billion to HAMP, of which at least $50 billion is
TARP money.

## C.     Duties of a Participating Servicer Under HAMP

55.     In March 2009, Defendant IMB HoldCo, LLC acquired IndyMac as New
IndyMac Bank, from the Federal Deposit Insurance Corporation (FDIC) and agreed that it would
participate in one or more programs that TARP authorized the Secretary of the Treasury to
establish in order to minimize foreclosures.

56.     Consistent with the TARP mandate, the Treasury Department implemented the
Home Affordable Modification Program ("HAMP") – designed to stem the foreclosure crisis by
providing affordable mortgage loan modifications and other alternatives to foreclosure to eligible
borrowers.

57.     On August 28, 2009, OneWest Bank, became a participating servicer of the
United States Treasury Department's Making Home Affordable Program (of which HAMP is a
subsidiary program) and executed a Servicer Participation Agreement (SPA) agreeing to follow
the guidelines and supplemental directives of the aforementioned programs.

58.     When OneWest signed a SPA with the U.S. Treasury it agreed in its capacity as
loan servicer[4] to participate in HAMP, to abide by HAMP's requirements, and to perform loan
modification and other foreclosure prevention services described in the program guidelines and
supplemental directives and amounts to a public proclamation of its intention to do so.

59.     As a Congressional Oversight Panel evaluating HAMP noted, "[p]articipation in
the program by servicers is voluntary, but once a servicer elects to participate, adherence to the
program standards is mandatory for all the servicer's loans."  Congressional Oversight Panel,
December 14, 2010 report at 4 (hereinafter COP Report – see Exhibit 1).[5]

---

[4] "Servicer" is the industry term for a financial institution that acts as agent for the owner of a loan to
perform many of the functions that deal directly with the homeowner, including processing of payment,
loss mitigation and overseeing foreclosure.
[5] *Available at* http://cop.senate.gov/reports/library/report-121410-cop.cfm.

17

60.     The SPA executed by OneWest incorporates all "guidelines," "procedures," and "supplemental documentation, instructions, bulletins, frequently asked questions, letters, directives, or other communications," referred to as "Supplemental Directives" issued by the Treasury, Fannie Mae or Freddie Mac in connection with the duties of Participating Servicers. These documents together are known as the "Program Documentation," *see* SPA § 1.A, and are incorporated by reference herein.   The SPA mandates that a Participating Servicer "shall perform" the activities described in the Program Documentation "for all mortgage loans it services."   SPA §§ 1.A., 2.A.[6]

61.     The first Supplemental Directive ("SD") was issued on April 6, 2009, and states that the national mortgage modification program was "aimed at helping 3 to 4 million at-risk homeowners – both those who are in default and those who are at imminent risk of default – by reducing monthly payments to sustainable levels."   SD 09-01 (Exhibit 2)  at 1.   This directive and the directives to follow were issued to provide guidance for adoption and implementation of HAMP "to provide a borrower with sustainable monthly payments."   *Id.*

62.     The Program Documentation requires Participating Servicers to evaluate all loans that are 60 or more days delinquent or appear to be in imminent default (as defined by the Program Documentation), to determine which loans meet the HAMP eligibility criteria.   SD 09-01 (Exhibit 2) at 4.   In addition, if a borrower contacts a Participating Servicer regarding a HAMP modification, the Participating Servicer must collect income and hardship information to determine if the borrower is eligible for a HAMP modification.   *Id.* at pp. 3-4.

63.     A HAMP Modification consists of two stages.   First, a Participating Servicer is required to gather information and, if appropriate, offer the homeowner a Trial Period Plan

---

[6] The Program Documentation also includes Supplemental Directive 09-01 ("SD 09-01," attached hereto as Exhibit 2), Home Affordable Modification Program; Base Net Present Value (NPV) Model Specifications ("NPV Overview," attached hereto as Exhibit 3) and Supplemental Documentation-Frequently Asked Questions ("HAMP FAQS," attached hereto as Exhibit 4), Supplemental Directive 09-08 ("SD 09-08," attached hereto as Exhibit 5).   The Program Documentation has been consolidated by the U.S. Treasury Department into a single document known as the Making Home Affordable Handbook ("Handbook," attached hereto as Exhibit 6).   These documents together describe the basic activities required under HAMP and are incorporated by reference in both of the TPP Agreements signed by Plaintiffs as well as in this Complaint.

18

("TPP") agreement. Second, upon successful completion of the TPP, the Servicer must offer the homeowner a permanent modification. Generally speaking, the goal of a HAMP modification is for owner-occupants to receive a modification of a first-lien loan by which the monthly mortgage payment is reduced to 31% of their monthly income.

64.     A mortgage is eligible for HAMP if threshold criteria enumerated in the Program Documentation are met. Aside from criteria that require the loan to be a first lien mortgage originated before 2009, that the property be occupied, and that it be the borrower's principal residence, the most salient conditions are that the loan is delinquent or default is reasonably foreseeable; that the borrower documents a financial hardship (as defined in the Program Documentation); and that the "borrower has a monthly mortgage payment ratio of greater than 31 percent" of the borrower's monthly income.

65.     HAMP Guideline and Supplemental Directive 09-01, page 14 (Exhibit 2), states that participating servicers should not proceed with a foreclosure sale until a borrower has been evaluated for HAMP and that servicers must use reasonable efforts to contact borrowers to determine their eligibility.

66.     HAMP Guideline and Supplemental Directive 10-02 (Exhibit), was issued to improve program effectiveness by amending policies and procedures related to initiation and continuation of foreclosure actions. Page 5 (Exhibit 3) of this Directive states that a servicer may not refer any loan to foreclosure or conduct a scheduled foreclosure sale unless and until at least one of five circumstances exist. Page 6 (Exhibit 3) of this Directive also sets a minimum time frame threshold in which a homeowner must request HAMP consideration in order to be entitled to such protection from foreclosure of 7 business days prior to a scheduled foreclosure date. Page 7 (Exhibit 6) of this Directive further states that servicers must implement written procedures applicable to all loans that are potentially eligible for HAMP and requires that the servicer provide a written certification to the foreclosure attorney/trustee that at least one of the five circumstances under the aforementioned Exhibit 4, and that all other available loss mitigation alternatives were exhausted and that a non-foreclosure outcome could not be reached.

19

Furthermore said certification must be provided no sooner than 7 business days prior to the scheduled foreclosure sale date. OneWest does not have discretion in applying these directives when it suits them.

67.     Once the participating servicer has determined a borrower meets HAMP's threshold requirements and is in active consideration for HAMP, based on both information already in its possession and information submitted by the applicant homeowner, the servicer is prohibited from initiating or proceeding with foreclosure action. In addition, if a borrower contacts a Participating Servicer regarding a HAMP modification, the Participating Servicer must collect income and hardship information to determine if the borrower is eligible for a HAMP modification. *Id.* at pp. 3-4.

68.     The servicer does this by applying the steps enumerated in the Program Documentation to the loan, in the stated order of succession until the borrower's monthly mortgage payment ratio is reduced to 31 percent of the borrower's monthly income. This process is known as the "waterfall." These steps include capitalizing accrued interest and escrow advances, reducing the interest rate, extending the term and re-amortizing the loan (if necessary), and providing a principal forbearance (if necessary). *See* SD 09-01 (Exhibit 2) at 8-10; *see also* Ex. 3 at 2. DEFENDANTS does not have discretion as to how this formula is applied – HAMP rules require servicers to take these enumerated steps in the prescribed order until the target monthly mortgage payment equaling 31% of monthly income is reached.

69.     If application of the steps in the Program Documentation yields terms that produce the target 31% monthly mortgage payment, the servicer must offer the borrower a TPP Agreement if the modification provides a net present benefit to the mortgage holder. This determination is known as the "Net Present Value" or ("NPV") test and is to be performed prior to the tender of a TPP Agreement

### D.     Economic Incentives Against Modifications

70.     Under HAMP, the federal government incentivizes participating servicers to make adjustments to existing mortgage obligations in order to make the monthly payments more

affordable. Servicers receive $1,000.00 for each HAMP modification. However, this incentive is countered by a number of financial factors that make it far more profitable for a mortgage servicer such as OneWest to avoid modification, continue to keep a mortgage in a state of default or distress and to push loans toward foreclosure or short sale. This is especially true regarding OneWest in cases where the mortgage is owned by a third-party investor and is merely serviced by OneWest as well as in cases where the mortgage is considered a qualifying loan under the loss sharing agreement with the FDIC because One West does not carry a significant risk of loss in the event of foreclosure, but would, in the majority of cases, actually profit from such action.

71.     Economic factors that discourage Defendants from providing permanent modifications under HAMP by facilitating loan modifications include the following:

a. Servicers have major issues regarding pre-existing contractual obligations regarding the pooling and servicing agreements (PSA) they entered into which significantly restrict the modifying of any given mortgage. The mortgage securitization process is complex. Mortgages are grouped together into pools and then sold to a Real Estate Mortgage Investment Conduits (REMIC), often called a special/single purpose vehicle or entity (SPV). A SPV is just a shell created to hold underlying assets (i.e. mortgages). The REMIC pays for the mortgages by issuing Bonds via a type of structured asset backed security called a collateralized debt obligation (CDO). The Bonds are collateralized by the mortgages owned by the REMIC and offered for sale via the CDO. The Bonds are a type of Mortgage Backed Security (MBS). The servicer of the mortgages now owned by the REMIC cannot arbitrarily change the terms of the PSA it executed when it sold the mortgages to the REMIC and these PSAs severely restrict the servicer's ability to modify the mortgages in the REMIC. There are several reasons for this. First, the Bondholders of the CDO are often ensured a certain

21

amount of revenue or return from the purchase of the Bonds. If a certain amount of mortgages in the REMIC are modified, thereby decreasing revenue, the CDO may not have enough cash flow to pay out revenues to all its Bondholders. Second, it is virtually impossible to change the terms of a PSA. The PSA is part of the indenture under which the bonds are issued. Under the governing Trust Indenture Act, consent of 100% of the Bondholders is needed to alter the PSA in a manner that would affect the CDO cash-flow as would certainly be the case as a result of widespread modifications to the underlying mortgages. The difficulty becomes apparent when one realizes that there are typically thousands of Bonds from a single CDO and Bondholders might be dispersed globally. Lastly, the previous problem becomes even more complex when synthetic collateralized mortgage obligations are taken into consideration. Bonds issued by a CDO are often divided into what are called Tranches. Each Tranch has different payment/risk priority tiers, each of which has a different rate of revenue, dividend and/or credit rating. The riskiest Tranches are not investment grade and as such cannot be sold to entities like pension and mutual funds, which make up the profile of a large percentage of purchasers of MBS Bonds. Therefore, these non-investment grade Bonds are often re-securitized into what are called synthetic collateralized debt obligations (SCDO). These SCDOs are a securitization in which the assets of the SCDO are the MBS Bonds issued by a CDO, rather than the underlying mortgages of said CDO. Despite the fact that a SCDO is nothing more than the repackaging of the riskiest Tranches of other CDOs, bonds issued by a SCDO are also divided into Tranches with similar payment/risk priority tiers. (While

22

Moody's, as well as Standard & Poor's, rated most of these SCDOs as investment grade they were in fact made up almost entirely of BBB-grade bonds from other CDOs.) The process is again repeated and the worst of the worst is repackaged as SCDO2. This process can be repeated (and often is) an endless number of times thereby making it practically impossible to obtain consent of 100% of Bondholders necessary to change the terms of a PSA. In the case of Defendant IndyMac, a significant majority of the mortgage loans they originated were of the non-conforming type which means they could not be securitized and the bonds sold to governmental or quasi-governmental purchasers of mortgage backed securities (i.e. FHA, Fannie Mae, Freddie Mac). This was because those loans were made with complicated high risk lending instruments which are considered too risky to back bonds sold to conforming mortgage bond purchasers. IndyMac's securitizations were thus governed by Restrictive Pooling and Servicing Agreements, which in order to protect revenue flow to the bond holders of such securitizations contain restrictive clauses limiting the number of loans which may have the terms of their mortgages modified as a percentage of the number of loans in a given pool or by a certain level of effect on revenue. As such only a small number of loans can be modified in a given pool of non-conforming mortgages (the majority of IndyMac's securitizations) governed by restrictive PSAs. The Defendants knew this yet agreed to accept the terms of the SPA they executed with the Treasury Department as was part of their agreement with the FDIC upon purchase of New IndyMac Bank, knowing full well they could never abide fully with the terms of such agreement with Treasury.

23

b. The monthly service fee that the Defendants, as the servicer, collects as to each loan they service in a pool of loans, is calculated as a fixed percentage of the unpaid principal balance of the loans in the pool. Consequently, delaying and/or not modifying a loan results in a higher monthly fee to the servicer.

c. Fees that the Defendants charge borrowers that are in default constitute a significant source of revenue to it. Aside from income the Defendants directly receive, late fees and "process management fees" are often added to the principal loan amount thereby increasing the unpaid balance in a pool of loans and increasing the amount of the servicer's monthly service fee.

d. Entering into a permanent modification will often delay a servicer's ability to recover advances it is required to make to investors of the unpaid principal and interest payment of a non-performing loan. The servicer's right to recover expenses from an investor in a loan modification, rather than a foreclosure, is often less clear and less generous. Servicers must forward mortgage payments to the Trust/REMICs on all defaulted mortgages. These payments are called servicing advances. Other servicing advances include, but are not limited to, property inspections, broker price opinions, appraisals, property management and maintenance, legal fees, service processing, etc. By manipulating a given mortgage loan a servicer can profit handsomely by delaying the actual foreclosure of said mortgage for a time lengthily enough to incur a significant amount of recoverable servicing advances (advances made by servicer which are paid back to servicer when foreclosure is complete) and foreclosing on said mortgage when its default has effectively "ripened". This is done by

24

stringing along the Borrower's attempt at modification so as to justify the time delay used primarily to allow the bill for servicing advances to pile up. Furthermore, this reimbursement structure limits servicers' incentive to rein in foreclosure costs and actually incentives them to pad the cost of foreclosure. Servicers will charge for unnecessary work and/or work that was never done (referred to in the mortgage securitization industry as "Junk Fees") in an effort to increase the costs of foreclosure and subsequently the amount of servicing advance fees collected when a foreclosure eventually takes place. This is a clever yet fraudulent balancing act to maximize profit using the borrower as an unwitting pawn in the scheme. While the servicer is making servicing advances, it appears to be losing money on the foreclosure process, yet this is offset later when recovery is made (after foreclosure) and profit is realized from the recovery of all the necessary and unnecessary servicing advances paid out by the servicer. To the public and the Trust it casts off any suspicions by claiming to be following HAMP guidelines and attempting to assist the borrower in modifying his/her mortgage when it has no intention and/or is contractually limited from doing so at all. In this manner a borrower is "ripened" or "seasoned" for maximum profitability in default status before a foreclosure in an effort to fraudulently maximize profits for a servicer.

e. Fixed overhead costs involved in successfully performing loan modifications involve up-front costs to the servicer for additional staffing, physical infrastructure, and expenses.

25

72.     Rather than allocating adequate resources and working diligently to reduce the number of loans in danger of default by establishing permanent modifications, the Defendants have:

a.   serially strung out, delayed, and otherwise purposefully hindered the modification process in an effort to deceive homeowners from the fact that they cannot (in most cases) modify a given mortgage due to the restrictions placed upon it as servicer under the pooling and servicing agreements it entered into previously;

b.   actually may profit from expediting foreclosure action, and concealing the alleged fact that a given loan may be considered a qualifying loan under Defendants loss sharing agreement with the FDIC, further incentivizing the Defendants to profit via foreclosure or short sale action rather than abiding by the agreement, executed with the United States Government to abide by HAMP Guidelines and Supplemental Directives;

c.   participated in and/or condoned the use of forged, improperly assigned, and improperly executed documents critical to establish their chain of title right to foreclose in an effort to foreclosure on as many mortgages as fast possible so as to unfairly profit from said act(s);

d.   deceptively concealed from Borrowers the fact that Notes/Deeds of Trust purported to be in default were actually in good standing as the Note-holder was in fact receiving payments on time from the third party Defendant servicer.

73.     Because the Defendants have or are ignoring their contractual obligations while fraudulently and deceptively, misleadingly publicly proclaiming to follow said guidelines, hundreds or thousands of homeowners are wrongfully being deprived of an opportunity to cure their delinquencies, pay their mortgage loans and save their homes. By failing to live up to its

26

obligations under the terms of the contracts it formed with United States Government while in fact proclaiming to be doing otherwise, the Defendants have left, i.e. hundreds or thousands of borrowers seeking modifications, in a state of limbo – often worse off than they were before they sought a modification from OneWest. Defendants' actions are fraudulent, misleading and purposefully deceptive, and are unfair under state laws.

## CLAIMS OF NAMED PLAINTIFFS

### IndyMac Fraudulently Represented the Financial Soundness of its Mortgage Products to Borrowers

74. Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

75. Plaintiff, Heang Ouch is a citizen of the State of Massachusetts residing at 43 Inland Street, Lowell, MA 01851, which is the subject property incorporated and referred to herein.

76. Plaintiff had no assets for a down payment for the purchase transaction of the subject property and no assets for reserve.

77. Defendant IndyMac knew borrower had insufficient assets to pay for a down payment so as to be financially vested in the purchase transaction, yet had developed a high risk lending instrument specifically tailored to the Plaintiff's situation (and for others so similarly situated) so as to make said loan to enrich themselves by fraudulently misrepresenting the financial soundness of this lending instrument to Plaintiff, knowing said loan would cause injury to the Plaintiff.

### Defendant's Actions Caused Injury to Plaintiffs

78. Plaintiffs have suffered injury caused by IndyMac's actions, including but not limited to the creation of a situation whereby Plaintiff would be unable to repay his No-Doc Loan obligation, improper negative reporting to credit bureaus, monetary damages from higher

27

principle balances, inappropriate fees and charges assessed to him, including broker price opinion fees, inspection fees, attorney's fees, "process management" fees, late fees and other charges associated with delinquency and default, increased accrued interest, legal fees for defense of eviction, and the eventual loss of his home and property.

## OneWest's Fraudulent, Deceptive and Misleading Representations Regarding Adherence to its HAMP SPA Agreement

79.    Plaintiffs repeat and re-alleges every allegation above as if set forth herein in full.

80.    Plaintiff, Heang Ouch is a citizen of the State of Massachusetts residing at 43 Inland Street, Lowell, MA 01851, which is the subject property referred to herein.

81.    Plaintiff made an application to the Defendants for consideration for his mortgage to be modified under the guidelines and supplemental directives of the U.S. Treasury Department's Making Home Affordable Home Affordable Modification Program that included personal financial information, tax information, and a statement attesting to his hardship on or about November 2009 with the assistance of Dragon Law Firm, PLLC of 101 North State Street, Suite 301, Concord, NH 03301.

82.    Plaintiff was determined by Defendants to have met the threshold requirements for HAMP, as described above.

83.    On or about May of 2010 Defendant denied Plaintiff for HAMP without providing Plaintiff with any reasonable explanation.

84.    On July 14, 2010, Harmon Law, P.C. sent Plaintiff a Notice of Intention to Foreclose on behalf of OneWest

85.    A foreclosure auction was held on Plaintiff's subject property on August 10, 2010 and said property was sold.

## Defendant's Actions Caused Injury to Plaintiff

86.    Plaintiff has suffered injury caused by OneWest's actions, including but not limited to, improper negative reporting to credit bureaus, monetary damages from higher principle balances, inappropriate fees and charges assessed to them, including broker price

28

opinion fees, inspection fees, attorney's fees, "process management" fees, late fees and other charges associated with delinquency and default, and increased accrued interest. Further, in many instances, OneWest actually encouraged or instructed borrowers to default on their loans in order to "qualify" for assistance, when in fact HAMP requires only that an "imminent risk of default" be attested to.

87.      Moreover, whenever OneWest delays the tender of a timely review of a modification request, TPP agreement and/or permanent HAMP modification the terms of such a modification are less beneficial to the homeowner than they otherwise would be had OneWest properly performed. If a class member has accepted a modification on terms that are less favorable than those of a HAMP-compliant modification offered at the close of their trial period, their injury is measured by the difference between the modification they accepted and the modification they were entitled to. If an eligible homeowner has not been tendered a permanent modification, their injury is measured by the difference between their current circumstances and the terms of the modification that they were entitled to – a difference that includes the wrongful loss of a property interest for those who have suffered foreclosure. If an eligible homeowner has been serially strung along in violation of HAMP Guidelines, then their injury is measured by the difference between their current circumstances and the terms of a modification to which they were entitled. Further, if an eligible homeowner has been foreclosed upon during the modification process, in violation of HAMP Guidelines and Supplemental Directives, then the Plaintiffs' are entitled to the return of said property and/or any value of same and/or costs arising from said foreclosure.

88.      OneWest's behavior has also left class members in limbo, wondering if their home can be saved and preventing homeowners from pursuing other avenues of resolution, including using the money they are putting toward trial period-level payments to fund bankruptcy plans, relocation costs, short sales or other means of curing their default.

89.      Plaintiff has been damaged because he has now been foreclosed upon, suffered the loss of his rightful property, and has incurred the costs of legal fees associated with eviction

defense. Furthermore, the Plaintiff owes far more money on his loan than he would have had
OneWest not fraudulently, misleadingly and deceptively represented to the public and to the
borrowers of the mortgages it holds and/or services that it would follow the guidelines and
supplemental directives of HAMP. Said damages are representative of damages sustained by
other members of the class.

## OneWest and its Consortium of Investor Defendants Violate Massachusetts Consumer Protection Act and Applicable Regulations

90.    Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

91.    Defendant's IndyMac, OneWest and its consortium of investor Defendants
conduct was unfair, deceptive, oppressive, unconscionable, and contrary to public policy and
generally recognized standards applicable to the consumer lending business by;

misrepresenting their intentions to arrange loan modifications for Plaintiffs, while in fact purposefully creating abusive roadblocks to deprive plaintiffs of the opportunity to seek assistance under a federal government program Defendants publicly represented they would abide by;

b. deceptively misleading plaintiffs by publicly claiming to be a participating servicer in a federal government mortgage modification program yet purposefully ignoring guidelines and directives of said federal program, seeking instead to enrich themselves by foreclosing (and/or facilitating short sales) on borrowers properties, while borrowers seek, in good faith, to modify their mortgages under said federal program;

c. engaging in intrinsic fraud by willfully, purposefully and systematically stalling Plaintiffs' legitimate requests to cancel foreclosures while actively seeking to be considered for a modification, in direct violation of guidelines and directives of aforementioned federal program;

d. deceptively and fraudulently seeking to and/or completing foreclosures on Plaintiff and other borrower's homes while having full knowledge that foreclosure documents are improperly reviewed (or not reviewed at all) and/or executed with fraudulent and/or improper signatures and;

f. deceptively and fraudulently seeking to and/or completing foreclosures on plaintiff and other borrower's homes while having full knowledge that no actual default under the terms of the note/deed of trust exists.

31

92.     Defendant's conduct as described in this complaint was willful or knowing within the meaning of Massachusetts Consumer Protection Act, G.L. c. 93A, §9.

## Defendant's Actions Caused Injury to Plaintiffs

93.     Plaintiff has suffered injury caused by Defendants' actions, including but not limited to, improper negative reporting to credit bureaus, monetary damages from higher principle balances, inappropriate fees and charges assessed to them, including broker price opinion fees, inspection fees, attorney's fees, "process management" fees, late fees and other charges associated with delinquency and default, and increased accrued interest.

94.     Moreover, whenever OneWest delays the tender of a timely review of a modification request, TPP agreement and/or permanent HAMP modification the terms of such a modification are less beneficial to the homeowner than they otherwise would be had OneWest properly performed. If a class member has accepted a modification on terms that are less favorable than those of a HAMP-compliant modification offered at the close of their trial period, their injury is measured by the difference between the modification they accepted and the modification they were entitled to. If an eligible homeowner has not been tendered a permanent modification, their injury is measured by the difference between their current circumstances and the terms of the modification that they were entitled to – a difference that includes the wrongful loss of a property interest for those who have suffered foreclosure. If an eligible homeowner has been serially strung along in violation of HAMP Guidelines, then their injury is measured by the difference between their current circumstances and the terms of a modification to which they were entitled. Further, if an eligible homeowner has been foreclosed upon during the modification process, in violation of HAMP Guidelines and Supplemental Directives, then the Plaintiffs' are entitled to the return of said property and/or any value of same and/or costs arising from said foreclosure.

95.     OneWest's behavior has also left class members in limbo, wondering if their home can be saved and preventing homeowners from pursuing other avenues of resolution,

including using the money they are putting toward trial period-level payments to fund bankruptcy plans, relocation costs, short sales or other means of curing their default.

96.    Plaintiff has been damaged because he has now been foreclosed upon, suffered the loss of his rightful property, and has incurred the costs of legal fees associated with eviction defense. Furthermore, the Plaintiff owes far more money on his loan than he would have had OneWest not fraudulently, misleadingly and deceptively represented to the public and to the borrowers of the mortgages it holds and/or services that it would follow the guidelines and supplemental directives of HAMP.  Furthermore, Plaintiff's have suffered significant stress and emotional distress as a direct result of Defendants' actions. Said damages are representative of damages sustained by other members of the class.

## Defendants Fraudulently Attempted and Completed Foreclosures by Utilizing False/Incorrect Documents and by False Representations

97.    Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

98.    Plaintiff's first mortgage loan was serviced by Defendants IndyMac and through acquisition of IndyMac, by OneWest Bank.

99.    On or about January 16, 2007, Plaintiff, Heang Ouch and his now estranged wife Narein Kong, purchased the property located at 43 Inland Street, Lowell, Ma 01851 in consideration of $240,000.00.

100.    .On or about January 23, 2007 a Quitclaim Deed was recorded in the Middlesex County North Registry of Deeds in Book 20908, Page 264 granting the Property to Plaintiff.

101.    On January 19, 2007, Plaintiff executed a Mortgage which identified IndyMac Bank, FSB as Lender on Page 1, Paragraph D. The Mortgage Deed was recorded in the Middlesex County north Registry of Deeds in Book 20908, Page 268.

102.    The Mortgagee named on the Plaintiff's mortgage at page 1, paragraph C is MERS.

33

142. On September 27, 2010, Harmon Law, P.C. filed a Summary Process proceeding to evict Plaintiff from the subject property referenced herein on behalf of FNMA.

143. Defendants knew their foreclosure processes were faulty and designed simply to foreclose on borrowers so as to enrich themselves in a fraudulent scheme. Furthermore, upon information and belief, no default of the Note existed to the unknown actual Note holder, thereby rendering the foreclosure and foreclosure proceedings were invalid.

## Defendant's Actions Caused Injury to Plaintiffs

144. Plaintiff has suffered injury caused by Defendant's actions, including but not limited to, the loss of his property through foreclosure, legal costs incurred to stay eviction, the unlawful payment of rent for use and occupancy of Plaintiff's property which was wrongfully foreclosed upon, mental and emotional distress intentionally inflicted by Defendants.

## CLASS ACTION ALLEGATIONS

145. Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

146. Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).

147. The named Plaintiffs sue on behalf of themselves and all Massachusetts homeowners whose loans have been originated by Defendant IndyMac using significantly reduced underwriting standards designed to allow borrowers to obtain mortgages without proper verification of income, using inflated appraisals and no money down programs, offering extremely risky credit terms to borrowers such as negative amortization, interest only payment options and, adjustable rate mortgage terms that Defendant IndyMac knew would be unsustainable for borrowers.

38

a.  the nature and scope of Defendants' representations regarding its intentions to properly administer and adhere to the guidelines and supplemental directives of the HAMP program and its representations to homeowners regarding HAMP;

b.  whether Defendants' conduct in the circumstances described herein and in the underlying complaints amounts to fraud;

c.  whether Defendants' conduct in the circumstances described herein and in the underlying complaints amounts deceptive and misleading business practices;

d.  whether Defendants' conduct violates applicable state Uniform Commercial Code and corresponding regulations; and

e.  whether the Court can order damages and enter injunctive relief.

153.    The claims of the Named Plaintiffs are typical of the claims of the Class and do not conflict with the interests of any other members of the class in that the Named Plaintiff and the other members of the class were subject to the same conduct.

154.    The named Plaintiff will fairly and adequately represent the interests of the Class. He is committed to the vigorous prosecution of the class claims and has retained attorneys who are qualified to pursue this litigation and have experience in class actions – in particular, consumer protection actions.

155.    A class action is superior to other methods for the fast and efficient adjudication of this controversy. A class action regarding the issues in this case does not create any problems of manageability.

156.    This putative class action meets both the requirements of Fed. R. Civ. P. 23(b)(2) and Fed. R. Civ. P. 23(b)(3).

157.    The Defendants acted or refused to act on grounds that apply generally to the class so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

## COUNT I

### By Ouch on behalf of himself and the Class
### for Fraud
### re: IndyMac's Representations regarding Soundness of its Mortgage Products

158.  Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

159.  Plaintiff brings this claim on his own behalf and on behalf of each member of the Class described above.

160.  Plaintiffs suffered damages as a result of Defendant IndyMac's originating residential mortgage loans using significantly reduced underwriting standards designed to allow borrowers to obtain mortgages without proper verification of income, using inflated appraisals and no money down programs, offering extremely risky credit terms to borrowers such as negative amortization, interest only payment options and, adjustable rate mortgage terms that Defendant IndyMac knew would be unsustainable for borrowers.

161.  Plaintiffs suffered damages as a result of Defendants' fraudulent misrepresentations regarding financial soundness of its mortgage loan products. Defendant IndyMac knew Plaintiff borrower had paid no down payment in his property's purchase transaction, yet had developed a high risk lending instrument specifically tailored to the Plaintiff's situation (and for others so similarly situated) so as to make said loan(s) to enrich themselves by fraudulently misrepresenting the financial soundness of this lending instrument to Plaintiff (and to others so similarly situated), knowing said loan would cause injury to the Plaintiff.

162.  Plaintiffs have suffered harm and are threatened with additional harm from Defendants fraudulent, deceptive and misleading statements, including but not limited to longer loan payoff times, higher principle balances, improper negative reporting to credit bureaus; inappropriate fees and charges assessed to them, including broker price opinion fees, inspection fees, attorney's fees, "process management" fees, late fees and other charges associated with

42

delinquency and default, increased accrued interest, the wrongful loss of a property interest for those who have suffered foreclosure, and legal fees for defense of eviction

163.   As a result of these fraudulent misrepresentations, Defendants caused Plaintiffs harm, as alleged above. Defendants' bad faith was thus to Plaintiffs' detriment.

## *COUNT II*

### *By Ouch on behalf of himself and the Class*
### *Breach of Duty Of Good Faith and Reasonable Diligence*

164.   Plaintiff repeats and re-allege every allegation above as if set forth herein in full.

165.   Plaintiff bring this claim on his own behalf and on behalf of each member of the Class described above.

166.   As the entity responsible for exercising the statutory power of sale, Defendant On West owed Plaintiff a duty of good faith and fair dealing in the conduct leading up to the foreclosure proceedings and sale.

167.   By conducting foreclosure proceedings without a valid assignment from MERS, Defendant violated this duty.

168.   Plaintiff was damaged by these breaches of duty including without limitation, loss of equity, lost opportunity to work out modification of his mortgage, by imposition of inappropriate foreclosure fees, and costs and costs of defending himself from eviction.

169.   The Plaintiff is entitled to a declaratory judgment determining that the foreclosure sale of his property is void.

170.   Plaintiff is entitled to an injunction requiring that Defendants' take all necessary steps to restore legal title to the property as if no foreclosure sale had ever occurred.

171.   Plaintiff is entitled to an injunction requiring that the Defendants be prevented from foreclosure action against Plaintiff or any eviction action until such time as proper notice is made pursuant to statute.

43

172.    The Plaintiff is entitled to cancellation of costs and fees assessed to his wrongful foreclosure, together with additional damages.

173.    Plaintiffs have suffered harm and are threatened with additional harm from Defendants fraudulent, deceptive and unlawful practices, including the wrongful loss of a property interest for those who have suffered foreclosure.

174.    Defendants conduct was likely to induce reliance and to create confusion and misunderstanding.

175.    Defendants conduct as set forth herein is not required, permitted or authorized by any state or federal law.

176.    Defendants conduct as set forth herein violates established public policy, and the harms caused to consumers greatly outweighs any benefits associated with that conduct.

177.    As a result of Defendants conduct, Plaintiffs suffered ascertainable damages and ascertainable losses including:

            a.      wrongful foreclosures;

            b.      otherwise avoidable losses of homes to foreclosure;

            c.      significant stress and emotional distress, and;

178.    Plaintiffs are entitled to actual, statutory and exemplary damages, restitution, an accounting, attorneys' fees and costs, equitable relief and all other relief as provided by state law.

## *COUNT III*
### *By Ouch on behalf of himself and the Class*
### *Violation of Massachusetts – Uniform Commercial Code*
### *Regarding Fraudulent Misrepresentation of Default Status of Note*

179.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

180.    The named Plaintiff brings this claim on his own behalf and on behalf of each member of the Class.

181.    Defendants conduct as set forth herein affects the public interest and is part of a generalized course of conduct affecting numerous consumers.

44

182.    Defendants OneWest and its consortium of investor Defendants have violated and continues to violate the Massachusetts Uniform Commercial Code, G.L. c. 15, Chap. 106, Art. 3, §3-602 and §3-603 including, without limitation;

        a.      §3-603 that tender of payment of the obligation to pay the instrument was made to the entity entitled to enforce the instrument yet the default provisions of the instrument were enforced;

        b.      §3-602 the instrument was paid on behalf of the party obligated to pay the instrument, and to an entity entitled to enforce the instrument, and as such to the extent of the payment the obligation of the party obliged to pay the instrument should have been discharged, instead Defendants claimed instrument was in default and proceeded to foreclosure.

183.    Plaintiffs have been injured suffered damages as a result of Defendants' fraudulent misrepresentations regarding the defaulted status of their Mortgage and/or Note

184.    Plaintiffs have suffered harm and are threatened with additional harm from Defendants fraudulent, deceptive and unlawful practices, including the wrongful loss of a property interest for those who have suffered foreclosure.

185.    As a result of these violations of Massachusetts Uniform Commercial Code, G.L. c. 15, Chap. 106, Art. 3, §3-602 and §3-603, Defendants caused Plaintiffs harm, as alleged above. Defendants' bad faith was thus to Plaintiffs' detriment.

186.    Defendants conduct was likely to induce reliance and to create confusion and misunderstanding.

187.    Defendants conduct as set forth herein is not required, permitted or authorized by any state or federal law.

188.    Defendants conduct as set forth herein violates established public policy, and the harms caused to consumers greatly outweighs any benefits associated with that conduct.

189.   As a result of Defendants conduct, Plaintiffs suffered ascertainable damages and ascertainable losses including:

        a.    wrongful foreclosures;

        b.    otherwise avoidable losses of homes to foreclosure;

        c.    significant stress and emotional distress, and;

190.   Plaintiffs are entitled to actual, statutory and exemplary damages, restitution, an accounting, attorneys' fees and costs, equitable relief and all other relief as provided by state law.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs respectfully request the following relief:

a.   Certify this case as a class action and appoint the named plaintiffs to be class representatives and their counsel to be class counsel;

b.   Enter a judgment declaring the acts and practices of Defendants complained of herein to constitutes a fraud, unfair and deceptive acts and practices, breach of duty of good faith and reasonable diligence, violations of state uniform commercial code, and consumer protection and unfair and deceptive acts and practices laws together with an award of monetary damages and other available relief on those claims;

c.   Grant a permanent or final injunction enjoining Defendants agents and employees, affiliates and subsidiaries, from continuing to harm Plaintiffs and the members of the Class;

d.   Order Defendants to adopt and enforce a policy that requires appropriate training of their employees and agents regarding their duties under HAMP;

e.  Order specific performance of Defendants obligations together with other relief required by law;

f.  Award actual, exemplary and/or statutory minimum damages;

g.  Award restitution and prejudgment interest;

h.  Award punitive damages;

i.  Award Plaintiffs the costs of this action, including the fees and costs of experts, together with reasonable attorneys' fees;

j.  Grant Plaintiffs and the Class such other and further relief as this Court finds necessary and proper.

Dated: 07/29/11

Respectfully Submitted,

Todd S. Dion, Esq. BBO # 659109
925 Reservoir Avenue, Lower Level
Cranston, RI 02910
Telephone: 401-663-0699
Facsimile:  401-270-2202
toddsdion@msn.com